**AFFIDAVIT OF SPECIAL AGENT KEVIN MCCUSKER
IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Kevin McCusker, being duly sworn, state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I have been a Special Agent of the Federal Bureau of Investigation ("FBI") since February 2004. I am currently assigned to the Economic Crimes Squad in the FBI's Boston Field Office, where I investigate possible violations of federal law, including wire fraud, bank fraud, and money laundering. I have participated in the execution of search, seizure, and arrest warrants related to criminal investigations. My investigations and training have included the use of surveillance techniques, confidential informants, and court-authorized interception of wire and electronic communications.

2.      As an FBI Special Agent, I am empowered by law to investigate violations of the laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants issued under authority of the United States.

3.      I am currently conducting an investigation of JAYNE CARBONE for violations of certain federal laws, including wire fraud, bank fraud, and money laundering.

4.      I make this affidavit in support of a criminal complaint charging CARBONE with wire fraud, in violation of 18 U.S.C. § 1343. Specifically, as set forth below, I have probable cause to believe that from approximately December 2016 through September 2018, CARBONE engaged in a scheme to fraudulently obtain money from her uncle, Wayne Kerr, whose personal finances CARBONE managed.

5.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents, law enforcement

officers, and witnesses. This affidavit is intended to show merely that there is probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED BY CARBONE

### Background and Overview of the Scheme

6.      CARBONE is currently a resident of Saugus, Massachusetts.

7.      During the relevant time period, including the period from approximately December 2016 through September 2018, CARBONE was responsible for managing the personal financial affairs of her elderly uncle, Wayne Kerr, who resides at 17 Grove Street in Chelsea, Massachusetts. Kerr lives on the first floor of the building and rents the remaining space to approximately eight tenants. Kerr also owns an adjacent parking lot at 15 Grove Street (hereinafter, 15-17 Grove Street is referred to as the "Grove Street Property"). CARBONE's responsibilities in her capacity as the manager of Kerr's financial affairs included collecting rent and paying expenses related to the Grove Street Property.

8.      Based on my investigation – including my review of financial records and interviews with witnesses – I am aware that beginning in or around December 2016 and continuing through in or around September 2018, CARBONE stole at least $400,000 from Kerr by fraudulently withdrawing funds from a brokerage account associated with an annuity policy held by Kerr and transferring those funds into bank accounts held by CARBONE and members of her immediate family for her personal use. To further and conceal the scheme, CARBONE provided Kerr with falsified annuity policy and bank account statements reflecting inflated balances.

Information Provided by Kerr and Other Family Members

9.      I have interviewed Kerr on two occasions.[1] Kerr explained that, as the manager of his financial affairs, CARBONE was responsible for cashing his Social Security and pension checks, collecting rent from the tenants of the Grove Street Property, paying bills and taxes associated with the property, and paying his personal bills and taxes. Kerr said that he did not pay CARBONE for her services but, instead, placed the Grove Street Property in her name.[2]

10.      In or about September 2017, Kerr signed a durable power of attorney (dated September 21, 2017) and a letter (dated September 19, 2017) purportedly authorizing CARBONE "to handle any/all banking transactions (cashing checks, withdrawals, etc.) that have to do with me and any/all of my accounts." The letter further provides as follows: "With my authorization (for well over three years), [CARBONE] has been cashing checks for me from all of my accounts and handling ALL of my banking business. I give [CARBONE] full authorization to handle all of my banking needs and to cash any checks that I give her from any of my accounts." Finally, the letter instructs that "all email correspondence should go to jaynebrook@aol.com (Jayne F

---

[1] Also present for the interviews were (1) Joseph Provanzano, the attorney representing Kerr in a civil lawsuit against CARBONE and others, which is discussed further below, and (2) various members of Kerr's family – specifically, Kerr's nephews and other niece, who are CARBONE's siblings. Kerr's nephews, Robert Brooks and John Brooks, were present for both interviews of Kerr. Kerr's other niece, Patricia Johnson, was present for the second interview of Kerr. These individuals provided certain information during the interviews of Kerr. Johnson was also interviewed separately, as discussed further below. Provanzano and the Brooks brothers were present for Johnson's interview as well.

[2] A quitclaim deed, which I have reviewed, shows that Kerr granted CARBONE a remainder interest in the Grove Street Property (with Kerr retaining a life estate).

Carbone's email address)" and provides an alternate phone number for Kerr: "(781) 718-5056 (Jayne F Carbone's cell phone)."[3]

11.     Kerr acknowledged having signed the durable power of attorney and above-described letter.[4] He explained that CARBONE had informed him that his bank would not allow CARBONE to conduct transactions on his behalf and CARBONE therefore suggested the power of attorney. Kerr further explained that he often signed documents presented to him by CARBONE because he trusted her. Kerr understood the power of attorney and letter that he signed as authorizing CARBONE to conduct financial transactions on his behalf, specifically to cash his Social Security and pension checks. Kerr stated that he did not authorize CARBONE to make withdrawals from his accounts for her personal use or to otherwise liquidate his accounts.

12.     Kerr further explained that each month, CARBONE provided him with statements from Citizens Bank, where Kerr held a checking account. The statements CARBONE provided to Kerr, which I have reviewed, as set forth below, consistently reflected an account balance of over $300,000. CARBONE also provided Kerr with quarterly statements from Nationwide Mutual Insurance Company ("Nationwide"), where Kerr held a personal non-qualified annuity policy. The

---

[3] The parentheticals in these quotations, including those identifying the email address and phone number as CARBONE's, appear in the letter.

[4] In his second interview, when shown a copy of the letter, Kerr said that he may have signed it but could not tell if it was his signature. Both the letter and the power of attorney appear to be notarized, but Kerr stated that he did not recall ever signing any documents presented to him by CARBONE with a notary present. The notary identified on both documents, Beverly A. Quinn Kirwan, told agents that she is a friend of CARBONE's and that, at CARBONE's request, she had notarized documents signed by Kerr on two occasions. Quinn Kirwan showed agents her notary book, which appears to corroborate the information provided by Quinn Kirwan. Specifically, the book indicates that on August 7, 2018, Quinn Kirwan notarized a pension recertification form signed by Kerr. Then, according to the book, on September 21, 2017, Quinn Kirwan notarized a durable power of attorney signed by Kerr. Quinn Kirwan stated that on both occasions CARBONE drove her to Kerr's home and both CARBONE and Kerr were present.

Nationwide statements CARBONE provided to Kerr, which I have reviewed, as set forth below, reflected a balance of over $160,000.

13.     Kerr stated that in or about the summer of 2018, he was contacted by Citizens Bank and informed that his checking account ending in 0204 ("CB-0204") was overdrawn. Kerr then obtained directly from Citizens Bank monthly statements for his account dating from June 2017 to August 2018. The statements, which I have reviewed, show that beginning in or around October 2017, there were regular online transfers from Kerr's account to another Citizens Bank account ending in 1329 ("CB-1329") and that, by July 2018, Kerr's account was overdrawn. Kerr told agents that he did not authorize CARBONE to transfer or otherwise withdraw money from his checking account.

14.     Upon discovering that his Citizens Bank account was overdrawn, in or around September 2018, Kerr obtained records from Nationwide. I have reviewed those records, which, as set forth in greater detail below, indicate that between January 2018 and September 2018, the annuity's value was reduced to less than $3,000. The records Nationwide provided to Kerr included a number of contract owner withdrawal forms, requesting withdrawals from the account and containing what appears to be Kerr's handwritten signature. Kerr stated that he did not recall signing the forms, did not submit the forms to Nationwide, and did not authorize the withdrawals.

15.     Kerr explained that in addition to discovering that his accounts had been liquidated, he was informed by the City of Chelsea that he owed $14,000 in back taxes on the Grove Street Property. Kerr explained that CARBONE was supposed to use the rental income she collected from his tenants to pay the bills associated with the property, and Kerr assumed she had been doing so, including paying taxes owed.

16.     Kerr's family members indicated that after Kerr learned the above, they confronted CARBONE about the missing funds and asked her to return the money.[5] Patricia Johnson – CARBONE's sister and Kerr's other niece – provided agents with copies of text messages she exchanged with CARBONE, including a September 4, 2018 message in which CARBONE asked, "Between you and I how much trouble am I in LOL[.]" The following day, Johnson texted CARBONE, "Please tell me you have some of this money stashed away?" CARBONE responded, asserting that she would "start putting money back."

17.     In late September 2018, Kerr filed a civil complaint in Essex County Superior Court against CARBONE and others, including Citizens Bank and Nationwide. The lawsuit remains pending.

### Review of Nationwide Records

18.     As set forth above, I have reviewed records obtained from Nationwide concerning Kerr's annuity policy. Those records show that, beginning in or around 2002, Kerr held a personal non-qualified annuity policy with two 50/50 beneficiaries: CARBONE and Johnson (as noted above, Johnson is CARBONE's sister and Kerr's other niece).

19.     A transaction confirmation statement for Kerr's Nationwide annuity policy account dated December 21, 2016 shows a beginning balance of approximately $408,355 and a withdrawal of $260,000 made on December 21, 2016. Transaction confirmation statements from July 2017 to July 2018 show that eight additional withdrawals were made, ranging in amounts between $7,000

---

[5] According to Kerr's nephews and niece, after being confronted, CARBONE began accusing Kerr and his nephews (CARBONE's brothers) of sexual abuse. CARBONE's family members have denied these accusations, which have also been raised in connection with the civil lawsuit referenced in paragraph 17.

and $30,000, and totaling $162,000, drawing the policy's value down to $2,736.32 as of July 12, 2018.

20.     Included in the records obtained from Nationwide are contract owner withdrawal forms for each of the above-referenced withdrawals. Each form contains Kerr's name and his purported signature as well as the email address "jaynebrook@aol.com." Based on my review of records obtained in connection with the investigation – including the letter described in paragraph 10 above – I believe this to be CARBONE's email address.

21.     The contract owner withdrawal forms were submitted to Nationwide via fax. The records obtained from Nationwide do not identify the sender's fax number for the form relating to the first withdrawal in December 2016. The remaining forms contain fax header information showing that the forms were faxed to Nationwide from the Boston Marine Society (fax number 617-241-0505). Based on my review of publicly available records, the Boston Marine Society is located in Charleston, Massachusetts and CARBONE was employed there as an administrative assistant as of November 2018.[6] Based on my review of the contract owner withdrawal forms, Nationwide identifies its own fax number as 888-634-4472. I have verified with a Nationwide representative that the fax machine associated with that number is located at Nationwide's processing facility in Grove City, Ohio.

22.     Based on the above, I believe that CARBONE prepared the contract owner withdrawal forms and transmitted them via fax from her place of employment in Boston, Massachusetts, to Nationwide's processing facility in Grove City, Ohio. According to the Nationwide representative referenced above, the resulting Nationwide distribution checks were

---

[6] Quinn Kirwan also confirmed that CARBONE works at the Boston Marine Society.

printed and mailed from the same Grove City, Ohio facility to Kerr's residence in Chelsea, Massachusetts.

23.     Nationwide records show that on or about September 7, 2018, a check for the remaining value of the annuity, $2,748.98, was issued at Kerr's telephonic request, effectively surrendering the policy. According to those records, Kerr called Nationwide and requested copies of all checks issued per each withdrawal on the account. The records contain notes from that call, which read, in part, "Client believes all w/ds other than the surrender were conducted by a niece and done in fraud. I did look at signatures from the original application and a couple w/ds and the signature does not match. The email provided on the forms are for the niece and not the Owner."

### Review of Citizens Bank and North Shore Bank Records

24.     As part of the investigation, I also obtained records from Citizens Bank and North Shore Bank for the following accounts, among others: (1) CB-0204, Kerr's checking account at Citizens Bank; (2) CB-1329, a Citizens Bank checking account in the name of CARBONE and her husband; and (3) a North Shore Bank checking account ending in 4784 ("NSB-4784") held by CARBONE and her husband. Based on my review of these records, I determined the following:

25.     Checks from Nationwide totaling $57,000 were deposited into CB-1329. Specifically, a Nationwide check in the amount of $30,000 was deposited into the account on or about August 7, 2017, and a second Nationwide check in the amount of $27,000 was deposited on or about September 12, 2017. Both checks were made payable to Kerr and were endorsed with the purported signature of Kerr and the signature of CARBONE.

26.     CB-0204 was opened on or about January 3, 2017 in Kerr's name. CARBONE was later added to the account as power of attorney. The first transaction reflected in the account is a January 3, 2017 deposit of a $260,000 check from Nationwide to Kerr. Four additional deposits

were made into the account on the same day, all of U.S. savings bonds payable to Kerr totaling approximately $115,000. During the relevant time period, an additional $105,000 was deposited into CB-0204 in the form of checks issued to Kerr by Nationwide.

27. From approximately January 3, 2017 to August 13, 2018, approximately $442,060 was transferred or withdrawn from CB-0204 and deposited into accounts held by CARBONE and members of her family, as described below:

a. A total of approximately $380,000 was electronically transferred from CB-0204 to CB-1329;

b. Official Citizens Bank checks totaling $34,960, drawn on CB-0204 and made payable to CARBONE, were deposited into NSB-4784. Specifically, a $15,960 Citizens Bank check was deposited into NSB-4784 on or about January 3, 2017, and a $19,000 Citizens Bank check was deposited into NSB-4784 on or about January 6, 2017.

c. A total of $4,100 was electronically transferred from CB-0204 to a Citizens Bank checking account ending in 7911 ("CB-7911"), which is in the name of CARBONE's son; and

d. Funds from a $28,000 personal check – drawn on CB-0204, dated July 10, 2017, made payable to CARBONE, and endorsed with what appears to be CARBONE's signature – appear to have been transferred first to CB-7911 and then to NSB-4784. Specifically, on or about July 10, 2017 (the same day the check was apparently written), there was a $23,000 deposit into CB-7911. That same day, a check in the

amount of $21,500 was written from CB-7911, made payable to CARBONE, and deposited into NSB-4784.[7]

28.     Therefore, in total, approximately $437,000 was deposited into CARBONE's CB-1329 account from Kerr's Nationwide and Citizens Bank accounts, which represents approximately 87 percent of the total deposits into CB-1329 during the relevant time period. My review of records for CB-1329 revealed that the vast majority of these funds were spent for CARBONE's (or her immediate family's) personal use, including the following (all in approximate amounts): $156,000 in ATM withdrawals, $81,000 in branch withdrawals, $108,000 in checks,[8] $100,000 in retail purchases, $8,700 in credit card payments, and a $9,900 transfer to CB-7911, the Citizens Bank account held by CARBONE's son.

29.     Records for NSB-4784, the North Shore Bank account held by CARBONE and her husband, show that prior to the January 3 and 6, 2017 deposits of the two Citizens Bank checks described above, the account was overdrawn. The January 2017 statement for the account shows that after these deposits, a number of retail purchases were made, including approximately $525 spent at the Palm Restaurant in Boston, approximately $605 spent at BJ's Wholesale in Revere, and approximately $560 spent at Athleta in Boston, all on January 9, 2017. There were also several checks drawn on the account, including over $7,100 payable to Provident Funding, a mortgage company that, according to the Essex County registry of deeds, holds the mortgage for

---

[7] In addition to the above, bank records show the following withdrawals from Kerr's CB-0204 account: a January 3, 2017 withdrawal in the amount of $10,000 and an August 24, 2017 withdrawal in the amount of $20,000. The final destination of these funds has not been determined, however, on or about August 24, 2017, CB-1329 received a deposit of $9,087.13.

[8] It appears that certain checks were issued to fulfill CARBONE's responsibilities in her capacity as the manager of Kerr's financial affairs. For example, there are checks to "MAR Oil" that appear to be payments for oil bills for the Grove Street Property.

CARBONE's home, and $5,300 payable to Travel Reports, a cruise line/travel company. By January 13, 2017, the NSB-4784 balance was below $600.

Falsified Nationwide and Citizens Bank Account Statements

30.     Based on my review of the evidence gathered in connection with this investigation, I believe that CARBONE stole funds from Kerr's Nationwide account via the faxed contract owner withdrawal forms, deposited a portion of those funds into her own Citizens Bank account and the remainder into Kerr's Citizens Bank account, then transferred funds from Kerr's Citizens Bank account to accounts held by CARBONE and members of her immediate family, and used those funds for personal expenses. To conceal the fraud, CARBONE falsified Kerr's Nationwide and Citizens Bank statements.

31.     The attorney representing Kerr in his civil lawsuit against CARBONE and others provided me with copies of the purported Nationwide and Citizens Bank statements that CARBONE gave to Kerr during the relevant time period. As stated above, the Nationwide statements CARBONE provided to Kerr reflected a balance of over $160,000, and the Citizens Bank statements CARBONE provided to Kerr consistently reflected an account balance of over $300,000.

32.     The genuine quarterly account statements obtained from Nationwide reflect a declining contract value balance consistent with the withdrawals being made from the account. For example, a quarterly account statement obtained from Nationwide dated June 30, 2018 shows a balance of $17,719.09. In contrast, the statement CARBONE provided to Kerr for that period shows a balance of $165,403.76.

33.     Similarly, the genuine monthly statements obtained from Citizens Bank reflect a declining balance consistent with the transfers and withdrawals being made from the account until

11

the balance was overdrawn in the summer of 2018. For example, a monthly account statement obtained from Citizens Bank dated July 13, 2018 shows an overdrawn/negative balance of $657.72. In contrast, the statement CARBONE provided to Kerr for that period shows a positive balance of $330,624.97.

**CONCLUSION**

34.     Based on my knowledge, training, and experience, and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that CARBONE committed wire fraud, in violation of Title 18, United States Code, Section 1343.

Respectfully submitted,

Kevin McCusker
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on December _9_, 2019

David H. Hennessy
United States Magistrate Judge

-